IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

JANE DOE,

      Plaintiff,

v.                                    Civil Action No. 2:10-2961-DCN

NORTHWESTERN MUTUAL
LIFE INSURANCE COMPANY,          **COMPLAINT**

      Defendant.               **(JURY TRIAL REQUESTED)**

_____

The Plaintiff, complaining of the Defendant herein, through Plaintiff's undersigned attorney, avers as follows:

1.      Jane Doe is not Plaintiff's actual name. Plaintiff has brought this suit under the pseudonym Jane Doe because in order to comply with pleading specificity requirements, Plaintiff has pled facts pertaining to confidential medical and psychiatric matters that fall within the Court's guidelines for protection of sensitive information.

**Jurisdiction and Venue**

2.      Plaintiff is a citizen and resident of Mt. Pleasant, South Carolina. Defendant, Northwestern Mutual Life Insurance Company ("NML"), is an insurance company organized and existing under the laws of the State of Wisconsin, and has its headquarters and principal place of business in the State of Wisconsin.

3.      The Court has subject matter jurisdiction to hear this case, under 28 U.S.C. § 1332, based on complete diversity of citizenship between the parties and because the

matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4. This Court has personal jurisdiction over NML because it does business in this District and Division, where Plaintiff undertook to purchase insurance from NML through a licensed agent of NML. Venue lies in this District under 28 U.S.C. § 1391(a).

## Relevant Facts

5. After graduating from medical school and completing a residency in obstetrics and gynecology ("OB/GYN"), Plaintiff became employed in 1996 as an assistant professor in the OB/GYN department at the Medical University of South Carolina ("MUSC").

### *Plaintiff's Purchase of Disability Income Insurance from NML*

6. In 1996, Plaintiff purchased disability income insurance from NML through NML's agent in Charleston, S.C., Stephen R. Riggs, who had contacted Plaintiff for that purpose shortly after she became employed at MUSC. Plaintiff's August 30, 1996 NML disability income insurance policy, including her application for such insurance (together, the "1996 policy"), is attached hereto as Exhibit 1, and incorporated herein by reference. The 1996 policy currently remains in effect.

7. The application for the 1996 policy was filled out by Mr. Riggs, pursuant to Plaintiff's instruction that she sought the broadest coverage available. The 1996 policy accordingly provides that in the event Plaintiff can no longer practice her medical specialty due to an accident or sickness, she is entitled to receive specified disability income benefits for so long as she remains disabled from practicing her medical

specialty.  However, the amount of the monthly disability income benefit for which NML was willing to insure Plaintiff under the 1996 policy ($1,645) was limited at the time by the terms of Plaintiff's employment with MUSC, which provided group disability income insurance for Plaintiff.

8.     Accordingly, upon the advice of Mr. Riggs, Plaintiff opted to include as part of the 1996 policy an "Additional Purchase Benefit," as reflected in part 8 of her application for the 1996 policy.  As explained to Plaintiff by Mr. Riggs, the Additional Purchase Benefit entitled her to increase the amount of her disability income insurance coverage with NML, as the coverage is defined in the 1996 policy, after each of several possible subsequent events, for example, if she got married, had a child, and/or earned more income.

9.     In 2002, and again in 2003, after having married and given birth to three children (and adopted a fourth), and having increased her earned income after leaving MUSC for private practice, Plaintiff undertook through Mr. Riggs to exercise her Additional Purchase Benefit option to increase the amount of her NML disability income insurance benefits (by $2000 per month in each instance).  Plaintiff's July 17, 2002 and July 6, 2003 NML disability income insurance policies, including her applications for such insurance (collectively, the "2002-2003 policies") are attached hereto as Exhibits 2 and 3, respectively, and are incorporated herein by reference.  The 2002-2003 policies are essentially identical, and currently remain in effect.  Each of those policies provides in Section 5.4 for a six-year limitations period for suit, as does the 1996 policy.

10.     Mr. Riggs filled out the applications for the 2002-2003 policies, pursuant to Plaintiff's instruction that she sought to exercise the Additional Purchase Benefit

option under the 1996 policy.  The Additional Purchase Benefit under the 1996 policy is invoked in part 6 of Plaintiff's applications for the 2002-2003 policies.  In exercising her Additional Purchase Benefit option in 2002 and 2003, Plaintiff was led by Mr. Riggs to believe, and did therefore believe, that she was purchasing additional amounts of disability income insurance coverage from NML that was identical in scope to the coverage under the 1996 policy.  Contrary to the requirements of South Carolina Code of Regulations, chapter 69-34, parts H(2) and H(8), neither Mr. Riggs nor NML ever advised Plaintiff of any limitations on coverage under the 2002-2003 polices that were not contained in the 1996 policy until after Plaintiff had submitted a claim under the 2002-2003 policies.

### *Plaintiff's Initial Disability Caused by Severe and Malignant Depression*

11.    By mid-2005, Plaintiff had been diagnosed by two psychiatrists as suffering from post-partum depression.  Plaintiff's depression became acute by late June 2005, when Plaintiff began expressing suicidal thoughts to a treating psychiatrist, Dr. Katherine Donovan.  On July 11, 2005, Plaintiff was admitted to the MUSC Institute of Psychiatry where Plaintiff received at least 20 electro-convulsive therapy ("ECT") "shock" treatments between July 14 and September 27, 2005.

12.    The ECT treatments did not provide lasting relief for Plaintiff's depression, and caused severe impairment of Plaintiff's memory, such that they were discontinued.  Plaintiff has since been under the regular care of two psychiatrists for the treatment of her depression, Dr. Donovan and Dr. Ziad Nahas, a leading specialist in treatment-resistant depression and brain stimulation at the MUSC Institute of Psychiatry.

After Dr. Donovan notified the state Board of Medical Examiners of Plaintiff's condition, Plaintiff's license to practice medicine was suspended.

13.     In an October 6, 2005 letter to Plaintiff, NML notified Plaintiff of its approval of Plaintiff's claim, based on her debilitating depression since late June 2005, for total disability income benefits under the 1996 policy as well as the 2002-2003 policies.  NML noted in the letter its position that under the 2002-2003 policies (unlike the 1996 policy), coverage for disabilities due to mental disorders, such as Plaintiff's depression, is limited to 24 months in total for the life of the policy.

14.     The treatment of Plaintiff's depression has included, in addition to psychotherapy and medications administered by Dr. Donovan, a surgical implant of a Vagal Nerve Stimulation ("VNS") apparatus in February 2006, prescribed and administered by Dr. Nahas to mitigate Plaintiff's suicidal impulses.  By November 2007, Dr. Nahas began administering newly available Transmagnetic Cranial Stimulation ("TMS") to treat Plaintiff's depression.  While the norm is five TMS treatments per week, Plaintiff was receiving three TMS treatments per day by December 2007.

15.     In February 2008, Plaintiff underwent brain surgery to implant an experimental Epidural Cortical Stimulation ("ECS") apparatus prescribed and administered by Dr. Nahas for further treatment of Plaintiff's recurring depression. When the ECS brain implant was activated the following month, Plaintiff experienced a rapid and sustained improvement in mood.  However, as detailed below, the ECT-induced impairment of Plaintiff's memory persisted.  Plaintiff therefore sought retraining to regain her lost medical knowledge and skills.

16.     In November 2008, however, Plaintiff began to slide back into depression. Plaintiff was thereafter hospitalized for treatment of her depression on three occasions, for a total of 14 days, through December 2008, and undertook intensive outpatient treatment at the MUSC Institute of Psychiatry through the spring of 2009. On April 22, 2009, however, Plaintiff attempted suicide by medicinal overdose. She was hospitalized for two days for emergency medical treatment, and then hospitalized for fifteen days at the MUSC Institute of Psychiatry, where she again attempted suicide by cutting her wrists. Shortly after her discharge, Plaintiff was rehospitalized after she informed Dr. Donovan of continuing suicidal ideation.

17.     While subsequent adjustments to the settings of Plaintiff's experimental ECS brain implant alleviated her depression, Plaintiff nevertheless experienced intermittent episodes of depression through the following year. In the summer of 2010, Plaintiff underwent surgery in order to adjust her VNS implant designed to control her depression. Plaintiff's mental condition remains fragile, at risk, and disabling.

### *Plaintiff's Subsequent Disability Caused by the Impact of Electro-Convulsive Therapy on Her Cognitive Functioning, Particularly Her Memory*

18.     As the ECT treatments for Plaintiff's depression proceeded in the summer of 2005, and were escalated to bilateral (bi-temporal) treatments by August 3, 2005, Plaintiff immediately began to report to her treating physicians that she was experiencing severe confusion and loss of memory functioning following those treatments. For example, on August 5, 2005, Dr. Donovan reported in an Attending Physician's Statement provided contemporaneously to NML that Plaintiff had experienced "severe confusion and memory loss ... due to ECT" and that "[h]er memory loss is <u>profound</u>...." (emphasis by Dr. Donovan). Subsequent such reports by Dr. Donovan to NML made

clear that Plaintiff's memory impairment was not temporary.  On September 6, 2006, Dr.

Donovan reported in an Attending Physician's Statement provided to NML that Plaintiff

"is not allowed to practice her specialty, or <u>any</u> medical specialty, <u>in</u> <u>any</u> <u>capacity</u>

<u>whatsoever</u>," due not only to her suicidal ideation but also to her "[s]evere memory

impairment" (emphasis by Dr. Donovan), adding that Plaintiff "can never receive ECT

again … due to her extreme mem[ory] loss."

19.     Dr. Donovan referred Plaintiff to a neuropsychologist, Dr. L. Randolph

Waid, for neuropsychological testing in February 2006.  The testing focused on

Plaintiff's cognitive functioning in the areas of attention/concentration, speed of mental

processing, and anterograde memory, *i.e*., the ability to form, retain and access new

(post-ECT treatment) memories, as opposed to retrograde memory -- the ability to retain

and access prior (pre-ECT treatment) memories.  There is no standard

neuropsychological test for retrograde memory functioning.  Dr. Waid's testing of

Plaintiff revealed significant impairment of her anterograde memory functioning, as well

as her capacities for attention/concentration and her mental processing speed.  Dr. Waid's

testing of Plaintiff included a Test of Memory Malingering, under which Plaintiff

performed well within the stringent criteria indicating good effort, such that the test

results are considered to be valid and reliable.  The results of Dr. Waid's

neuropsychological testing of Plaintiff (and the underlying data) were provided to NML

in 2007.

20.     Plaintiff's underwent back surgery on November 2, 2006 and suffered a

post-operative respiratory arrest (stroke).  A CT brain scan that day indicated two small

brain lesions (lacunar infarcts).  On this basis, Drs. Waid and Nahas have concluded that

Plaintiff suffered a brain injury from the respiratory arrest, exacerbating her memory impairment.

21.     Plaintiff was referred in this regard to a neurologist, Dr. James L. Bumgartner, who has continued to evaluate periodically Plaintiff's persistent reports of retrograde memory loss, particularly the impairment of her medical knowledge, notwithstanding alleviation of her depression.  Dr. Bumgartner has concluded, based on his own clinical assessment of Plaintiff as well as the neuropsychological testing of Plaintiff by Dr. Waid, that Plaintiff is suffering from an organic brain syndrome (comparable to that caused by a mild traumatic brain injury or epilepsy), in the form of permanent ECT-induced memory impairment, both retrograde and anterograde, that is independent of Plaintiff's history of depression and any medications taken by her, and independently precludes the resumption of her medical practice.  Drs. Waid, Nahas, and Donovan have concurred in this diagnosis, which is supported by ECT studies presented in medical journals, and by an expert involved in such studies.  The conclusions of Drs. Bumgartner, Waid, and Donovan in this regard were provided to NML in 2007.

22.     Beginning in November 2007, during periods when Plaintiff was not experiencing suicidal ideation, Plaintiff made concerted but unsuccessful efforts to resume the practice of medicine, whether in a reduced role within her previous OB/GYN specialty or in a less demanding medical field, or at least to find employment related to medicine.  Despite her strong desire to resume her medical career or find related employment, however, Plaintiff informed colleagues from whom she sought assistance, as well as potential employers, that Plaintiff needed to reacquire medical knowledge and skills that she had lost as a result of her ECT treatments.

23.     Thus, in late November 2007, Plaintiff wrote to the Co-Chairman of the OB/GYN Department at MUSC explaining her treatment for disabling depression, and her hope of lasting recovery, but stating in part:

> … I underwent 21 ECT treatments that severely affected my memory to the point that I cannot remember enough of medicine to practice, cannot remember my honeymoon, cannot remember taking [my daughter] to Disney [W]orld.  I had to relearn how to drive. … It has been two years now and I am told by my neurologist that what I have is all that I have without laying down new memory on top of old ones. … I miss medicine. It is so tantalizingly close but yet so far from my grasp. … I am asking you humbly if there were any way that you could consider helping me to retrain to do office gynecology starting next fall.  I do not expect pay.  I just need someone reliable to help me get there and feel that I have really learned and know what I need to know.  I am not asking you to displace a resident.  I can come to the clinic just a few days a week or whatever would work with the clinic schedule. …

The Co-Chairman wrote back some two weeks later, declining Plaintiff's request and stating among other things: "from what you communicate in your email, it would seem that you would need more than just retraining as part of a clinical residency, you would need to repeat medical school."  Plaintiff repeatedly acknowledged to Dr. Donovan (in emails and otherwise) Plaintiff's concern that she did not retain enough medical knowledge to successfully complete another residency, despite her determination to try.

### *NML's Bad-Faith Denial of Plaintiff's Claim for Continuing Coverage under the 2002-2003 Policies*

24.     In a July 25, 2007 letter to Plaintiff, NML acknowledged Plaintiff's claim for continuing coverage under the 2002-2003 policies, beyond the two-year limitation that NML had invoked for Plaintiff's initial disability caused by her malignant depression.  At this point, Plaintiff sought continuing coverage based primarily on her separate disability caused by her permanent ECT-induced memory impairment, including

her loss of critical medical knowledge and skills. As requested by NML in this regard, Plaintiff provided NML with contact information for several of Plaintiff's treating physicians – Drs. Bumgartner, Waid, and Donovan – and authorized NML to contact them and obtain verification of Plaintiff's memory impairment. By letter of September 12, 2007, NML informed Plaintiff that it was reviewing her additional disability claim, but that pending a final decision on that claim, Plaintiff's disability benefits would be suspended under the 2002-2003 policies. NML has continued to provide Plaintiff with disability benefits under the 1996 policy.

25. By letter of February 8, 2008, NML denied Plaintiff's additional disability claim based on her permanent ECT-induced memory impairment. However, NML's letter erroneously posited that Plaintiff had first reported neurocognitive impairment in February 2006, ignoring the fact, documented in Dr. Donovan's Attending Physician Statements, that Plaintiff had reported severe memory problems immediately after bilateral ECT treatments in early August 2005. NML's letter went on to focus on limited improvements in Plaintiff's cognitive functioning, as measured by Dr. Waid's repeat testing, but the improvements and testing did not relate to Plaintiff's retrograde (pre-ECT) memory loss. While NML's letter dismissed the stand-alone significance of Plaintiff's respiratory arrest following back surgery in November 2006, NML virtually ignored the immediate, profound and disabling effect on Plaintiff of multiple bilateral ECT treatments in August 2005, which precipitated her persisting organic brain syndrome, including her permanent retrograde memory loss. Instead, NML's letter speculated self-servingly that "impairment prior to the [back] surgery was likely secondary to … [Plaintiff's] mood state and perhaps medications." Yet the letter had

pointed to limited improvements in Plaintiff's anterograde functioning that occurred despite her continuing "mood state and … medications."

26.     Plaintiff contested through her attorney, by letter of May 2, 2008, NML's denial of her additional disability claim based on her permanent ECT-induced memory impairment.  Plaintiff's letter quoted from the reports by Dr. Donovan, provided to NML shortly after Plaintiff's bilateral ECT treatments, that Plaintiff was suffering from severe memory loss as a result of those treatments.  Plaintiff's letter likewise quoted the opinions issued by Drs. Bumgartner and Waid that Plaintiff's impaired cognitive functioning in this and other respects was attributable to organic brain syndrome caused by Plaintiff's ECT treatments.  Notably, NML has never sought to interview Plaintiff or consult with any of her treating physicians.  Plaintiff's letter further summarized and attached a leading medical research report issued in 2005 by several prominent practitioners in the field, demonstrating that multiple bilateral ECT treatments are correlated to a significant degree with severe and persisting retrograde amnesia and other cognitive impairments, particularly in the case of female patients.  Plaintiff's letter also explained how her claim for additional disability benefits based on her permanent ECT-induced memory impairment was clearly within the coverage of the 2002-2003 policies, and strongly supported by the law in analogous cases.

27.     Shortly after Plaintiff's May 2, 2008 letter was sent, Plaintiff received a copy of a letter sent to the President of NML by its agent, Stephen R. Riggs, on April 28, 2008.  This letter is attached hereto as Exhibit 4 and incorporated by reference herein.  Mr. Riggs stated in his letter that in selling the 1996 policy and the 2002-2003 policies to Plaintiff, he and Plaintiff had mutually intended that, by exercising the Additional

Purchase Benefit under the 1996 policy, Plaintiff would obtain the same coverage under the 2002-2003 policies as under the 1996 policy.  Mr. Riggs urged in his letter that NML should honor that mutual intention, stating:

> What [Plaintiff] or her agent didn't know, is that … [NML] would change the future contracts that she was being guaranteed the right to purchase; which she thought would be identical to the original contract, not one that would have limitations to coverage that her original does not have.

Exhibit 4 hereto, at p. 2.  NML summarily rejected this view, without coming to grips with it, in a reply letter dated May 6, 2008.

28.     Pending NML's response to Plaintiff's May 2, 2008 letter, Plaintiff sought assurance from NML that it was not necessary to maintain the 2002-2003 policies going forward, by paying ongoing premiums, in order to preserve Plaintiff's pending claim that additional and continuing benefits were already owing under those policies.  Plaintiff could ill afford to pay such premiums at the time and thereafter.  NML provided a confusing response by letter of September 17, 2008, "urg[ing] [Plaintifff] to continue the premium payments."  On September 25, 2008, Plaintiff sought clarification through her counsel.  NML never responded, with the result that Plaintiff has needlessly paid premiums to NML that Plaintiff could ill afford.

29.     NML did not reply to Plaintiff's May 2, 2008 letter until October 23, 2008.  NML's letter of that date suggested that Plaintiff's claim for continuing disability benefits under the 2002-2003 policies, based on Plaintiff's permanent ECT-induced retrograde memory impairment, was fabricated, simply because Plaintiff had not included that claim (only a claim based on Plaintiff's severe depression, which gave rise to the ECT treatments) in her initial request for benefits under those policies on August 12, 2005.  However, Plaintiff's bilateral ECT treatments had begun only a few days before

that date (on August 3, 2005), and Plaintiff could not at the time evaluate the permanence of the side-effects of those treatments on her memory or other cognitive functions.

30.     Moreover, Plaintiff had immediately reported to Dr. Donovan, who informed NML on August 5, 2005, that Plaintiff had experienced "severe confusion and memory loss … due to ECT" and that "[h]er memory loss is profound…." (emphasis by Dr. Donovan).  Dr. Donovan provided NML with similar reports in subsequent Attending Physician Statements that she submitted to NML.  Moreover, on October 19, 2005, Plaintiff submitted a Request for Continuance of Disability Benefits form to NML that attributed her disability at the time not only to depression, but also to "cognitive impairment," and each of the subsequent such Requests that were submitted to NML by Plaintiff are consistent in this regard, *e.g*., Request submitted on November 26, 2005 ("…confusion; impaired mental capacity"); Request submitted on December 21, 2005 ("memory loss; cognitive dysfunction; …unable to drive"); Request submitted on February 21, 2006 ("cognitive impairment; memory loss…"); Request submitted on July 26, 2006 ("…cognitive impairment and continued memory loss"); Request submitted on January 20, 2007 ("cognitive reasoning & severe memory loss…").

31.     NML's October 23, 2008 letter further asserted that NML's "'in-house' psychiatric experts have provided opinions after examining the medical records" and "[t]hey did not find support for an organic brain syndrome."  No such opinions were provided to Plaintiff, however, nor has NML ever explained why it never even interviewed Plaintiff or consulted with any of her treating physicians.

32.     Instead, NML relied in its October 23, 2008 letter on a report by a psychiatrist in private practice in Columbia, South Carolina, Dr. Todd Engles, even

though he had never undertaken to contact Plaintiff or consult with her treating physicians. While Dr. Engles' report purported to rely on the neuropsychological testing of Plaintiff performed by Dr. Waid, Dr. Engles never sought to consult with Dr. Waid, who strongly disagrees with Dr. Engles' conclusions. While Dr. Engles' report asserted that Plaintiff's ECT treatments were beneficial – to the extent that they may have saved Plaintiff's life – that assertion by no means precludes a disabling side-effect of bilateral ECT treatments, causing permanent retrograde memory loss in susceptible patients. In asserting in his report that there are no reliable long-term studies documenting any such potential side-effect, Dr. Engles turned a blind eye to the 2005 study that Plaintiff had provided to NML.

33. Dr. Engles' report strained to posit ostensible reasons for denying Plaintiff's claim for continuing benefits under the 2002-2003 policies. While his report speculated that Plaintiff's cognitive impairments might be attributable to Plaintiff's medications, or to her depression itself, this ignores the fact that Plaintiff's retrograde memory loss has persisted in periods when her depression has been alleviated and her medications have been changed and tapered off. While Dr. Engles' report asserted that there is no information to exclude a personality disorder, Plaintiff's treating physicians had rejected any such diagnosis and had rejected any issue of fabrication on the part of Plaintiff (which Dr. Waid's testing rules out). The suggestion in Dr. Engles' report that Plaintiff is not in fact disabled at all, because she assertedly maintained an unrestricted license to practice medicine, is uninformed factually and is recklessly offensive and threatening.

34.     Not content with Dr. Engles' report, NML's October 23, 2008 letter went on to assert that Plaintiff's claim for continuing benefits under her 2002-2003 policies is unambiguously precluded in any event under the terms of those policies.  NML suggested in this regard that "[w]hether organic brain syndrome is a legitimate diagnosis, [Plaintiff] continues to receive supportive psychotherapy and medical management" from Dr. Donovan, such that under Section 3.4 of the policies, Plaintiff's claim supposedly falls within the two-year restriction on coverage for a mental disorder "customarily within the scope of treatment of psychiatrists."  However, Dr. Donovan treats Plaintiff's malignant depression (her initial disability), not Plaintiff's retrograde memory loss (a separate disability), for which there is no effective treatment, not even by a neurologist (such as Dr. Bumgartner), as Plaintiff's medical witnesses will confirm.

35.     NML further suggested in its October 23, 2008 letter that Plaintiff's organic brain syndrome in the form of impaired memory is not a "separate disability" within the meaning of Section 2.11 of the policies, which provides separate coverage if "the cause of the later disability is not medically related to the cause of the earlier one."  NML relied in this regard on the fact that "the organic brain syndrome was caused by the treatment [Plaintiff] received for the depression."  This is not a good-faith basis for denying continuing benefits under the 2002-2003 policies, and is inconsistent with South Carolina Code of Regulations, chapter 69-34, part G(8)(a)(1)(iii).  Plaintiff's ECT-induced impairments could not be "medically related to the cause" of Plaintiff's malignant depression, which preceded the ECT treatments.  Under the strained reasoning of NML's letter, there could be no separate disability for any injury sustained in the treatment of Plaintiff's malignant depression, even if Plaintiff were physically and

permanently paralyzed, or rendered comatose, due to some mishap in administering ECT or TMS (*e.g.*, electrical surge, falling) or in conducting brain surgery to implant a VNS or ECS device.

36.    For all of the reasons set forth above, NML's denial of Plaintiff's claim for continuing disability benefits under the 2002-2003 policies was plainly erroneous, and reflects bad faith on the part of NML.

### *Adverse Impact on Plaintiff of NML's Bad-Faith Denial of Her Claim*

37.    When NML initially denied Plaintiff's claim for continuing benefits under the 2002-2003 policies (on February 8, 2008), Plaintiff's malignant depression had resurfaced and she was struggling to hold her suicidal ideation at bay through unusually intensive TMS treatments.  That same month, Plaintiff underwent brain surgery to implant the experimental ECS device designed to aid her in battling severe depression. The following month, Plaintiff experienced a sustained alleviation of her depression after the ECS device was activated.  Soon thereafter, she began to seek a way to resume her medical practice through retraining, in large part out of financial desperation due to NML's denial of her claim for continuing benefits under the 2002-2003 policies. Plaintiff had been the primary breadwinner for her family.  Her husband is self-employed as an ocean shipping consultant, and had put aside his work, which requires frequent travel, in order to care for his wife and their four small children virtually around the clock.

38.    In hopes of avoiding the need to repeat medical school *and* undertake another four-year residency in order to recover her lost medical knowledge and skills,

Plaintiff pursued the possibility of 'merely' undertaking an additional residency, in a less demanding specialty than OB/GYN, which required her to be on call through the night frequently. From May 2008 forward, Plaintiff expended considerable time and effort preparing to apply and applying for residency programs in anesthesiology or emergency room medicine, *e.g.*, obtaining old transcripts and new letters of recommendation, studying for certification in advanced cardiac life support, attending grand rounds each week for both the medicine and anesthesiology departments at MUSC, re-reading medical textbooks, and seeking continuing medical education credits to maintain her board certification.

39.     Plaintiff also began volunteering three hours per week at a free clinic for indigent patients, where she worked under close supervision, having disclosed her impairments, and relied heavily upon textbooks and a hand-held computer (iPhone application for medicine). Dr. Donovan, with the concurrence of Drs. Nahas and Waid, reactivated Plaintiff's medical license in June 2008 for this limited purpose, and for the broader purpose of supporting her efforts to resume her medical practice through retraining, in light of her apparent progress toward better control of her malignant depression. (After Plaintiff had relapsed into severe depression in 2009, Dr. Donovan so notified the state Board of Medical Examiners, which again placed Plaintiff's medical license on inactive status).

40.     In response to her applications for a residency position (and given the reactivation of her medical license), Plaintiff was granted interviews at the following medical schools, to take place on the following dates: at her alma mater, the Medical College of Virginia, on October 3, 2008; at the University of North Carolina on

November 13, 2008; at Johns Hopkins on November 30, 2008; at the University of Virginia on December 1, 2008; and at MUSC on December 6, 2008.

41.     While Plaintiff believed that her interview at the Medical College of Virginia had gone well, she was crushed to learn on October 23, 2008 that she was denied admission to its anesthesiology residency program.  The following day, Plaintiff received NML's October 23, 2008 letter (which had been faxed to her counsel), denying once again her claim for continuing benefits under the 2002-2003 policies, and seemingly questioning her integrity.  By this point, Plaintiff and her husband had exhausted their home equity, and the family was subsisting on withdrawals from their 401K retirement funds (despite steep penalties).  By early November 2008, Plaintiff had begun to slide back into her malignant depression, and required hospitalization at the MUSC Institute of Psychiatry for three days.

42.     Plaintiff nevertheless felt compelled by financial pressure to attend her interview at the University of North Carolina on November 13.  Later that month, she again required hospitalization at the MUSC Institute for Psychiatry for anxiety and depression, this time for four days.  Upon her discharge on November 29, Plaintiff nevertheless felt compelled by financial pressure to attend her interview at Johns Hopkins on the following day, and her interview at the University of Virginia the day after that.  Upon her return, Dr. Donovan referred Plaintiff to the intensive outpatient program at the MUSC Institute of Psychiatry.  Plaintiff nevertheless delayed her participation in that program so that she could attend her interview at MUSC.  By the end of the month, Plaintiff required hospitalization at the MUSC Institute of Psychiatry for seven days for her resurgent malignant depression, which was exacerbated in March 2009 when she

learned that each of her residency applications had been denied, and eventually led to her two suicide attempts in April 2009, and her hospitalization for twenty days.

43.     NML's bad-faith denial of Plaintiff's claim for continuing benefits under the 2002-2003 policies was a primary cause of Plaintiff's relapse into malignant depression in November 2008, leading to her periodic hospitalization, her two suicide attempts, and her extended re-hospitalization.   While Plaintiff did miss practicing medicine, her primary motivation in seeking to resume her practice through lengthy and onerous retraining, despite the fragility of her mental condition, was the financial pressure imposed upon her family by NML's bad-faith denial of her claim.   Indeed, Plaintiff expressed some ironic relief to Dr. Donovan that her residency applications were denied because Plaintiff harbored considerable doubt that she retained enough medical knowledge to complete a residency successfully, and was concerned about the burdens that it would place upon herself and her family.   NML imposed upon Plaintiff the need to nevertheless pursue such an onerous course, and set her up for relapse into malignant depression.

44.     Plaintiff is by no means fabricating the loss of much of her medical knowledge and skills in order to avoid the need to earn a living.   Rather, Plaintiff has been actively seeking to regain her ability to practice medicine through lengthy and onerous retraining, despite the ever present threat of recurrence of her malignant depression, due to the financial pressure created for her family by NML's bad-faith denial of continuing disability benefits under the 2002-2003 policies.   Indeed, after a resumption of her medical career was foreclosed by March of 2009, Plaintiff applied to nursing school, sought employment as an administrator at Roper Hospital, and applied for

positions with numerous pharmaceutical companies, but without any success due to her disabilities. While Plaintiff's only remaining recourse is to pursue this lawsuit, Drs. Donovan and Nahas have expressed concern that to undergo deposition and trial, which Plaintiff is willing to do, could further jeopardize her ability to control her malignant depression.

## FOR A FIRST CAUSE OF ACTION

### Claim for Breach of Contract
### in Failing to Meet Obligations Under Insurance Policies

45.     All allegations of this Complaint, to the extent not inconsistent, are incorporated by reference for purposes of this claim.

46.     The 2002-2003 policies are mutually binding contracts between Plaintiff and NML.

47.     NML breached the 2002-2003 policies by denying Plaintiff's claim thereunder for disability income benefits based on Plaintiff's permanent ECT-induced memory impairment. That disability is not subject to the limitation of Section 3.4 of those policies because (among other things) it is not customarily within the scope of treatment of psychiatrists, psychologists, psychotherapists or counselors, and is not effectively treatable at all. That disability is not medically related to the cause of Plaintiff's malignant depression, which is a separate disability under Section 2.12 of the 2002-2003 policies.

48.     The 1996 policy is a mutually binding contract between Plaintiff and NML which includes an Additional Purchase Benefit that entitled Plaintiff to purchase additional amounts of disability income insurance from NWM, on specified occasions,

- 21 -

having the same scope of coverage as the 1996 policy. The 1996 policy provides that if Plaintiff can no longer practice her medical specialty due to an accident or sickness, Plaintiff is entitled to receive specified disability income benefits for so long as she remains disabled from practicing her medical specialty.

49. Plaintiff invoked the Additional Purchase Benefit of the 1996 policy in Plaintiff's applications for the 2002-2003 policies.

50. NML breached the Additional Purchase Benefit provision of the 1996 policy by issuing the 2002-2003 policies with a narrower scope of coverage than the 1996 policy, without providing Plaintiff with adequate notice of that narrower scope of coverage, as is required by South Carolina Code of Regulations, chapter 69-34, parts H(2) and H(8).

51. Plaintiff complied with the 1996 policy and the 2002-2003 policies in all relevant respects to the extent that Plaintiff was required to do so.

52. Plaintiff is entitled to recover full disability income benefits under the 2002-2003 policies for the period from September 2007 forward based on Plaintiff's permanent ECT-induced memory impairment.

53. Alternatively, in accord with the Additional Purchase Benefit provision of the 1996 policy, Plaintiff is entitled to recover full disability income benefits under the 2002-2003 policies for the period September 2007 forward based on Plaintiff's continuing malignant depression, just as Plaintiff continues to receive disability income benefits for her continuing malignant depression under the 1996 policy.

54.     Plaintiff is entitled to recover from NML upfront the present value of full disability income benefits under the 2002-2003 policies for Plaintiff's entire actuarial lifetime going forward, based on Plaintiff's permanent ECT-induced loss of medical knowledge and skills, and/or her persistent malignant depression that resurfaces under stress, which independently prevent Plaintiff from ever resuming her OB/GYN medical specialty.

55.     Plaintiff is entitled to prejudgment interest at a rate of 8.75% per annum, pursuant to South Carolina Code § 34-31-20(A), on disability income benefits owed from September 2007 through the date of judgment.

56.     Plaintiff is entitled to recover punitive damages from NML for its willful and reckless disregard of Plaintiff's rights under the insurance policies sold by NML to Plaintiff.

57.     Under South Carolina Code § 38-59-40 and otherwise, Plaintiff is entitled to recover from NML all of Plaintiff's attorneys' fees and other litigation costs, including (without limitation) all costs associated with expert witnesses, reasonably incurred in pursuing Plaintiff's claims for continuing disability income benefits that NML denied without reasonable cause.

58.     Plaintiff has suffered foreseeable damages, within the reasonable contemplation of NML and Plaintiff, as a proximate result of NML's breach of the 2002-2003 policies and its breach of the Additional Purchase Benefit of the 1996 policy.  NML is liable to Plaintiff for all such consequential, special, and other damages, including (without limitation) damages for emotional distress, reimbursement of premiums paid under the 2002-2003 policies since September 2007 plus prejudgment interest thereon

pursuant to South Carolina Code § 34-31-20(A), compensation to make Plaintiff whole for withdrawals from Plaintiff's and her husband's 401K retirement accounts since September 2007, and compensation for all costs incurred by Plaintiff and her husband since that time that would not otherwise have been incurred but for NML's denial of Plaintiff's claims, including (without limitation) debt costs, all costs of pursuing medical retraining and continuing medical education, and all out-of-pocket costs incurred for medical treatment due to Plaintiff's relapse into active malignant depression as a result of NML's denial of Plaintiff's claims under the insurance policies that she purchased from NML.

## FOR A SECOND CAUSE OF ACTION

### Claim for Specific Performance
### of Obligations under Insurance Policies

59.    All allegations of this Complaint, to the extent not inconsistent, are incorporated by reference for purposes of this claim.

60.    Plaintiff is equitably entitled to specific performance of the 2002-2003 policies, as well as the Additional Purchase Benefit provision of the 1996 policy, inasmuch as Plaintiff lacks an adequate remedy at law for NML's breach thereof, to the extent that Plaintiff cannot recover as damages, in an action at law, a future stream of disability income insurance benefits, or the present value thereof. Plaintiff should therefore be awarded in equity the present value of the future stream of benefits under the 2002-2003 policies, on terms providing coverage identical to that of the 1996 policy in accord with Plaintiff's exercise of the Additional Purchase Benefit thereunder.

61.     In the event that Plaintiff does not recover the present value of the future stream of benefits under the 2002-2003 policies, the Court should declare and decree that NML is equitably required to perform under the 2002-2003 policies by providing Plaintiff with full monthly disability income benefits thereunder on an ongoing basis into the future, with the same scope of coverage as the 1996 policy, so long as Plaintiff remains disabled by her permanent ECT-induced memory loss and/or her malignant depression.

62.     The trier of fact should also award Plaintiff all other relief such as that sought by Plaintiff for NML's breach of contract under the First Cause of Action above.

## FOR A THIRD CAUSE OF ACTION

**Claim for Breach of Implied Covenant of Good Faith and Fair Dealing, Including Damages for Emotional Distress, Punitive Damages, Attorneys' Fees, Present Value of Insurance Proceeds, and All Other Damages**

63.     All allegations of this Complaint, to the extent not inconsistent, are incorporated by reference for purposes of this claim.

64.     NML acted unreasonably and in bad faith in processing Plaintiff's claims for continuing benefits under the 2002-2003 policies after September 2007, and in denying those claims, whether they were based on Plaintiff's permanent ECT-induced memory loss or on Plaintiff's malignant depression.  NML thereby violated the implied covenant of good faith and fair dealing that governs the 2002-2003 policies and the 1996 policy under controlling South Carolina law.

65.     NML failed to meet its obligation to conduct a reasonable and good-faith investigation of Plaintiff's claim for continuing disability benefits under the 2002-2003 policies based on Plaintiff's separate disability arising from her permanent ECT-induced

memory loss. NML never even sought to interview Plaintiff, nor did it ever seek to consult with any of Plaintiff's treating physicians, notwithstanding that Plaintiff had provided NML with the reports, records, and opinions of her treating physicians, and relied upon them in support of her claim, as reflected in Plaintiff's May 2, 2008 letter (through her attorney) to NML. NML acted unreasonably and in bad faith by relying on its own self-serving interpretation of those reports, records, and opinions, or by dismissing or ignoring them altogether, without even consulting with the treating physicians who prepared them based on their extensive clinical evaluation of Plaintiff. Under these circumstances, NML violated the implied covenant of good faith and fair dealing under controlling South Carolina law even if it were found (it should not be) that NML somehow did not breach the 2002-2003 policies.

66. Similarly, in processing and denying Plaintiff's claim based on the Additional Purchase Benefit under the 1996 policy, NML undertook no investigation and provided no justification whatsoever, notwithstanding that its own agent urged that the claim was valid.

67. NML violated the implied covenant of good faith and fair dealing by failing to exercise honest and informed judgment in processing Plaintiff's claims for continuing disability benefits under the 2002-2003 policies, and instead setting out to deny those claims, and asserting strained and dubious reasons for doing so, regardless of whether any such ostensible reasons had any real basis.

68. For example, NML simply ignored that fact that Plaintiff reported profound memory loss immediately after she began receiving bilateral ECT treatments, and ignored the authoritative study (enclosed with Plaintiff's May 2, 2008 letter to NML)

documenting that bilateral ECT treatments may cause severe and persisting retrograde memory loss, extending back years, in susceptible patients, particularly women. Instead, NML relied upon its bare assumption that Plaintiff's memory loss was just as likely attributable to her depression or medications, even though the memory loss persisted when Plaintiff's depression was alleviated (as it was for an extended period after Plaintiff received an ECS brain implant) and when her medications were changed and tapered off. Under controlling South Carolina law, an insurer acts in bad faith even when it denies a claim based on evidence that is equally consistent with coverage or non-coverage of the claim.

69.    The same principle applies where, as here, an insurer denies a claim based upon a dubious interpretation of the terms of the insurance policy. As demonstrated earlier, NML's October 23, 2008 letter to Plaintiff denied her claim based in part on its untenable interpretations of Sections 3.4 and 2.12 of the 2002-2003 policies. Moreover, Plaintiff's May 2, 2008 letter (through her attorney) had pointed out to NML the fallacy of such interpretations, particularly under the rule of law that any doubts are resolved in favor of the insured. NML's reliance nonetheless on dubious and self-serving interpretations of the terms of the 2002-2003 policies further reflects NML's bad faith. NML knew or should have known that there is no reasonable basis for denial of Plaintiff's claims for continuing benefits under the 2002-2003 policies.

70.    NML's bad-faith processing and denial of Plaintiff's claims is clearly evident in NML's baseless and reckless insinuations that Plaintiff's memory loss is fabricated. For example, NML's October 23, 2008 letter pointed out in this regard that Plaintiff's memory loss was not reported in Plaintiff's initial request for benefits on

August 12, 2005, yet Plaintiff's bilateral ECT treatments did not begin until August 3, 2005 and two days later, Dr. Donovan reported to NML that Plaintiff had suffered "severe" and "profound" memory loss and confusion due to ECT – a disability claim likewise reflected in Plaintiff's periodic requests for continuance of benefits beginning in October 2005. It was reprehensible for NML's purported expert, Dr. Engles, to speculate baselessly that Plaintiff's reports of memory loss could be attributable to a personality disorder, and to insinuate recklessly that Plaintiff is lying about her memory loss and depression because her medical license supposedly had not been not suspended -- without ever inquiring of Plaintiff or Dr. Donovan in that regard. Insinuations of fabrication are preposterous in view of Plaintiff's efforts at the time to undertake onerous retraining in order to compensate for her memory loss.

71.     Plaintiff sought to rely on her disability income insurance policies to protect her family financially at a time when Plaintiff was most vulnerable. Instead, NML took advantage of Plaintiff's vulnerability by denigrating her disability claim to the point that Plaintiff felt compelled to make a heroic effort to return to work, and thus to forego disability income insurance benefits to which she is otherwise entitled. NML's bad-faith processing and denial of Plaintiff's claims is particularly outrageous in view of Plaintiff's malignant depression with suicidal ideation, of which NML was well aware, and in view of the role NML played in aggravating that condition with severe consequences (nearly tragic) for Plaintiff.

72.     Plaintiff is entitled to recover damages from NML to fully compensate Plaintiff for the severe emotional distress suffered by Plaintiff that was proximately caused by NML's breach of the implied covenant of good faith and fair dealing

governing the insurance policies sold by NML to Plaintiff.  NML recklessly inflicted severe emotional distress on Plaintiff by denying her claim in bad faith at a time when Plaintiff already suffered from malignant depression (as NML well knew), thereby aggravating Plaintiff's acute anxiety for the welfare of her family, financially and otherwise, to the point of such desperation that Plaintiff undertook onerous and ultimately self-defeating efforts to obtain medical retraining, despite her fear of the unique burdens it would impose on her -- given her battle with depression and lost medical knowledge -- and her family, and despite the very real risk of failure.  In response to Plaintiff's request for reconsideration of her claim, NML arbitrarily dismissed it as fabrication not even worthy of thorough investigation, at the same time that Plaintiff was crushed by her alma mater's rejection of her application for retraining (presumably because she had disclosed her loss of medical knowledge), causing Plaintiff's relapse into malignant depression. Despite resultant intermittent hospitalization, Plaintiff was compelled by NML's bad-faith rejection to redouble her efforts to obtain medical retraining, leading to further hospitalization, further rejection for medical retraining, and ultimately to suicide attempts.  Now Plaintiff faces the further considerable stress of litigation against the recalcitrant NML, and the possibly public airing of these intimate and sensitive personal matters.

73.    Plaintiff is entitled to recover punitive damages from NML for its willful and reckless disregard of Plaintiff's rights under the insurance policies sold by NML to Plaintiff, including NML's breach of the implied covenant of good faith and fair dealing governing those insurance policies.

74.     Under South Carolina Code § 38-59-40 and otherwise, Plaintiff is entitled to recover from NML all of Plaintiff's attorneys' fees and other litigation costs, including (without limitation) all costs associated with expert witnesses, reasonably incurred in pursuing Plaintiff's claims for continuing disability income benefits that NML denied without reasonable cause and in bad faith, in violation of the implied covenant of good faith and fair dealing governing the insurance policies sold by NML to Plaintiff.

75.     In view of NML's violation of the implied covenant of good faith and fair dealing, Plaintiff is entitled to recover from NML upfront the present value of full disability income benefits under the 2002-2003 policies for Plaintiff's entire actuarial lifetime going forward, based on Plaintiff's permanent ECT-induced loss of medical knowledge and skills, and/or her persistent malignant depression that resurfaces under stress, which independently prevent Plaintiff from ever resuming her OB/GYN medical specialty.

76.     Plaintiff is likewise entitled to recover from NML all disability income benefits that NML should already have paid to Plaintiff under the 2002-2003 policies since September 2007, plus prejudgment interest thereon pursuant to South Carolina Code § 34-31-20(A).

77.     Plaintiff is also entitled to recover from NML all other damages to Plaintiff flowing from NML's breach of the implied covenant of good faith and fair dealing governing the insurance policies sold by NML to Plaintiff, including (without limitation) reimbursement of premiums paid under the 2002-2003 policies since September 2007 plus prejudgment interest thereon pursuant to South Carolina Code § 34-31-20(A), compensation to make Plaintiff whole for withdrawals from Plaintiff's and her

husband's 401K retirement accounts since September 2007, and compensation for all costs incurred by Plaintiff and her husband since that time that would not otherwise have been incurred but for NML's bad-faith denial of Plaintiff's claims, including (without limitation) debt costs, all costs of pursuing medical retraining and continuing medical education, and all out-of-pocket costs incurred for medical treatment due to Plaintiff's relapse into active malignant depression as a result of NML's bad-faith processing and denial of Plaintiff's claims under the insurance policies that she purchased from NML.

### FOR A FOURTH CAUSE OF ACTION

**Claim for Reformation of Insurance Policies**
**Based on Mutual Mistake in Effectuating Mutual Intent**

78.     All allegations of this Complaint, to the extent not inconsistent, are incorporated by reference for purposes of this claim.

79.     In applying for the 1996 policy, Plaintiff intended to obtain the Additional Purchase Benefit in accordance with her application and the advice and representations of NML agent Riggs in that regard.  Plaintiff was advised by Mr. Riggs at the time that the Additional Purchase Benefit would entitle her to purchase additional disability income insurance from NML, on specified future occasions (e.g., upon giving birth), providing coverage identical to the broad coverage provided by the 1996 policy.  Plaintiff relied on the advice of Mr. Riggs in this regard, and agreed to purchase the 1996 policy on that basis.

80.     Mr. Riggs acknowledged in his April 28, 2008 letter to the President of NML (Exhibit 4 hereto) that, acting on behalf of NML, Riggs had likewise always intended that the 1996 policy that he "talked   [Plaintiff] into purchasing," which

- 31 -

"included the Additional Purchase Benefit" that he and Plaintiff later invoked when she purchased the 2002-2003 policies, would thereby entitle Plaintiff to purchase additional disability income insurance from NML with coverage identical to the coverage provided by the 1996 policy, and that he had so advised Plaintiff and sold the 1996 policy and the 2002-2003 policies to her on that basis.  Mr. Riggs acknowledged in that letter that:

> What [Plaintiff] or her agent didn't know, is that the finest insurance company in the world would change the future contracts that she was being guaranteed the right to purchase; which she thought would be identical to the original contract, not one that would have limitations to coverage that her original does not have.

> [Plaintiff]'s claims on her two APB policies have been terminated due to the 24 month limitation of mental disorders, yet she continues to receive benefits on her original policy. …

> [Plaintiff] thought she was purchasing a contract that would protect her family from economic loss due to a disability; it seems she was wrong. And I guess I was wrong in believing that the policy I was initially selling [Plaintiff] would protect her, and Northwestern Mutual Life would take care of her.  I wonder about the ethics of all this, is the best I can expect from the finest insurance company in America?

> … I have represented NML for 26 years and would hate to think I made a mistake by selling her this contract and the great company which stands behind it.

81.     Plaintiff and NML, through its agent Riggs and otherwise, made a mutual mistake in that, despite their mutual intention that coverage under the 2002-2003 policies would be identical to coverage under the 1996 policy, a two-year limitation on coverage for mental disorders that was not contained in the 1996 policy was mistakenly included in the 2002-2003 policies.

82.     In purchasing the 2002-2003 policies pursuant to the Additional Purchase Benefit of the 1996 policy, Plaintiff relied on the advice and representations of Mr. Riggs that coverage under the 2002-2003 policies would be identical to coverage under the 1996 policy, and agreed to purchase the 2002-2003 policies on that basis.  Plaintiff likewise relied in this regard on the expertise held out by Mr. Riggs.  As stated in Mr. Riggs' above-referenced April 28, 2008 letter: "[Plaintiff] was not only purchasing a disability contract, she was purchasing an agent, who she felt had done his homework…."

83.     In selling the 2002-2003 policies to Plaintiff, NML gave Plaintiff no notice that coverage thereunder would be narrower than coverage under the 1996 policy, notwithstanding that in invoking the Additional Purchase Benefit under the 1996 policy in applying for the 2002-2003 policies, Plaintiff expressly sought no less coverage, and notwithstanding the notice requirements of South Carolina Code of Regulations, chapter 69-34, parts H(2) and H(8).  Prior to pursuing a claim under the 2002-2003 policies, Plaintiff was not aware that under those policies, unlike the 1996 policy, coverage for certain mental disorders may be limited to two years, or that coverage under the 2002-2003 policies was in any way narrower than coverage under the 1996 policy.

84.     For all of the foregoing reasons, Plaintiff is entitled to reformation of the 2002-2003 policies, to conform them to parties' mutual intent in entering into agreements for the purchase and sale of those policies, such that coverage under the 2002-2003 policies shall be no less than coverage under the 1996 policy, under which Plaintiff is entitled to receive full disability income benefits for so long as she remains disabled from practicing her medical specialty.  The trier of fact should so find and declare, and award Plaintiff full disability income benefits under the 2002-2003 policies for the period from

September 2007 forward, along with all other relief such as that sought by Plaintiff for NML's breach of contract under the First Cause of Action above, here sought independently thereof.

## FOR A FIFTH CAUSE OF ACTION

### Claim for Coverage Under Insurance Policies
### Based on Equitable Estoppel

85.     All allegations of this Complaint, to the extent not inconsistent, are incorporated by reference for purposes of this claim.

86.     NML, through its agent Riggs and otherwise, misrepresented and failed to disclose material facts to Plaintiff, or willfully conveyed the impression to her that the facts were other than, and inconsistent with, those subsequently asserted by NML in denying coverage under the 2002-2003 policies beyond two years.

87.     NML did so by providing to Plaintiff the 2002-2003 policies for which Plaintiff had applied by invoking her Additional Purchase Benefit under the 1996 policy, but without providing Plaintiff with any express notice that coverage under the 2002-2003 policies was narrower than under the 1996 policy, contrary to the requirements of South Carolina Code of Regulations, chapter 69-34, parts H(2) and H(8). NML failed to provide any such notice despite NML's prior representations and advice to Plaintiff, through NML's agent Riggs, who had established a relationship of trust and confidence with Plaintiff, that by invoking the Additional Purchase Benefit under the 1996 policy, Plaintiff could rest assured that the 2002-2003 policies would have the same scope of coverage as the 1996 policy, and would not have to compare them line-by-line to make sure of that fact.

88.     NML did so with the intention or expectation that as a result of such conduct, Plaintiff would purchase the 2002-2003 policies from NML, notwithstanding that they provided narrower coverage that the 1996 policy.  NML did so with actual or constructive knowledge of the facts upon which it now relies.

89.     Plaintiff relied on the representations and conduct of NML, through its agent Riggs and otherwise, and was misled thereby.  Plaintiff was not aware of the facts upon which NML now relies prior to pursuing a claim under the 2002-2003 policies.  If Plaintiff had been given timely and effective notice by NWM that coverage under the 2002-2003 policies was materially narrower than under the 1996 policy, Plaintiff would have sought to purchase disability income insurance with broader coverage, in lieu of the 2002-2003 policies.

90.     NML accordingly is equitably estopped from now relying on provisions of the 2002-2003 policies that provide less coverage than under the 1996 policy, such as a provision placing a two-year limitation on coverage for certain mental disorders.  The trier of fact should so find and declare, and award Plaintiff full disability income benefits under the 2002-2003 policies for the period from September 2007 forward, along with all other relief such as that sought by Plaintiff for NML's breach of contract under the First Cause of Action above, here sought independently thereof.

## FOR A SIXTH CAUSE OF ACTION

### Claim for Coverage Under Insurance Policies
### Based on Promissory Estoppel

91.     All allegations of this Complaint, to the extent not inconsistent, are incorporated by reference for purposes of this claim.

92.     NML, through its agent Riggs, promised Plaintiff that pursuant to an Additional Purchase Benefit under the 1996 policy, Plaintiff would be entitled to purchase additional insurance from NML, on specified occasions, with the same coverage as the 1996 policy, and that the 2002-2003 policies that Plaintiff later purchased in reliance upon the Additional Purchase Benefit would accordingly have the same coverage as the 1996 policy.

93.     Plaintiff reasonably relied on NML's promises, as was intended, expected and foreseeable by NML, both in purchasing the 1996 policy and in purchasing the 2002-2003 policies, thereby foregoing opportunities to purchase other insurance, in lieu of the 2002-2003 policies, that would have met Plaintiff's expectations by providing the same scope of coverage as the 1996 policy.

94.     NML should accordingly be bound by its promises to Plaintiff under the doctrine of promissory estoppel, such that coverage under the 2002-2003 policies shall be no less than coverage under the 1996 policy, under which Plaintiff is entitled to receive full disability income benefits for so long as she remains disabled from practicing her medical specialty.  The trier of fact should so find and declare, and award Plaintiff full disability income benefits under the 2002-2003 policies for the period from September 2007 forward, along with all other relief such as that sought by Plaintiff for NML's breach of contract under the First Cause of Action above, here sought independently thereof.

## <u>FOR A SEVENTH CAUSE OF ACTION</u>

### Claim for Negligence

95.     All allegations of this Complaint, to the extent not inconsistent, are incorporated by reference for purposes of this claim.

96.     NML, and its agent Riggs, had a pecuniary interest in their dealings with Plaintiff that are the subject of this Complaint.

97.     NML, through its agent Riggs, undertook to advise Plaintiff regarding the purchase of disability income insurance from NML, and therefore undertook a duty to use due care in so advising Plaintiff.

98.     NML, through its agent Riggs, promised Plaintiff that NML would sell her additional insurance having no less coverage than the 1996 policy that it sold her, and NML therefore undertook a duty to use due care in making such promise to Plaintiff, and in undertaking to meet such promise.

99.     NML, through its agent Riggs, established a relationship of trust and confidence with Plaintiff, beginning with Plaintiff's application to purchase the 1996 policy from NML and extending through and beyond Plaintiff's purchase of the 2002-2003 policies from NML. Plaintiff relied upon the advice and promises of Mr. Riggs regarding Plaintiff's purchase of insurance from NML and related matters.

100.     NML, through its agent Riggs, undertook a duty to disclose material facts to Plaintiff in that Riggs undertook to advise Plaintiff and established a relationship of trust and confidence with her.

101.    NML had a duty, under South Carolina Code of Regulations, chapter 69-34, parts H(2) and H(8), to provide to Plaintiff, no later than the time when NML delivered the 2002-2003 policies to her, an outline of coverage under those policies that (1) described all provisions of those policies which restrict, reduce, or limit payment of benefits thereunder and (2) provided clear notice to Plaintiff that coverage under the 2002-2003 policies "is not identical to the outline of coverage provided upon application and the coverage originally applied for has not been issued."

102.    NML had a duty, through its agent Riggs and otherwise, to explain clearly to Plaintiff the terms and conditions of the insurance policies that it sold to her.

103.    NML had a duty to use due care in processing Plaintiff's applications for insurance, and in processing claims under the insurance policies that it sold to Plaintiff.

104.    NML breached each of those duties to Plaintiff by negligently failing to use the due care required under the circumstances, and by acting with reckless disregard of its duties to Plaintiff.

105.    NML's breaches of those duties to Plaintiff constitute a proximate cause of injuries to Plaintiff for which NML is liable in tort to Plaintiff for all resultant damages to Plaintiff, including (without limitation) damages for emotional distress, damages for the loss of disability income benefits under the 2002-2003 policies from September 2007 forward, plus prejudgment interest pursuant to South Carolina Code § 34-31-20(A) on benefits owed from September 2007 through the date of judgment, reimbursement of premiums paid under the 2002-2003 policies since September 2007 plus prejudgment interest thereon pursuant to South Carolina Code § 34-31-20(A), compensation to make Plaintiff whole for withdrawals from Plaintiff's and her husband's 401K retirement

accounts since September 2007, and compensation for all costs incurred by Plaintiff and her husband since that time that would not otherwise have been incurred but for NML's denial of Plaintiff's claims, including (without limitation) debt costs, all costs of pursuing medical retraining and continuing medical education, and all out-of-pocket costs incurred for medical treatment due to Plaintiff's relapse into active malignant depression as a result of NML's negligent processing and denial of Plaintiff's claims under the insurance policies that she purchased from NML.

106.    Plaintiff is entitled to recover from NML upfront the present value of full disability income benefits under the 2002-2003 policies for Plaintiff's entire actuarial lifetime going forward, based on Plaintiff's permanent ECT-induced loss of medical knowledge and skills, and/or her persistent malignant depression that resurfaces under stress, which independently prevent Plaintiff from ever resuming her OB/GYN medical specialty.

107.    Plaintiff is entitled to recover punitive damages from NML for its willful and reckless disregard of Plaintiff's rights under the insurance policies sold by NML to Plaintiff.

### FOR AN EIGHTH CAUSE OF ACTION

### Claim for Negligent Misrepresentation

108.    All allegations of this Complaint, to the extent not inconsistent, are incorporated by reference for purposes of this claim.

109.    NML, through its agent Riggs and otherwise, undertook a duty of care not to misrepresent material facts to Plaintiff, whether by failing to disclose material facts or

or by conveying a false impression of material facts or otherwise. NML undertook such duty, through its agent Riggs and otherwise, by virtue of the pecuniary interest of NML and its agent Riggs in their dealings with Plaintiff, and by virtue of their relationship of trust and confidence with Plaintiff based on their superior knowledge and expertise regarding insurance matters that was held out to Plaintiff by Mr. Riggs, and upon which Plaintiff relied.

110.    NML, through its agent Riggs and otherwise, breached its duty of care to Plaintiff by negligently misrepresenting material facts to Plaintiff, through its failure to disclose material facts to Plaintiff and by conveying to her a false impression of material facts and otherwise, and by acting with reckless disregard of its duties to Plaintiff, as hereinbefore alleged (for example, in paragraph 87 above).

111.    Plaintiff justifiably relied on those misrepresentations of material fact by NML, through its agent Riggs and otherwise, in purchasing the 2002-2003 policies from NML. As proximate result of such reliance, Plaintiff suffered pecuniary loss and was otherwise injured.

112.    Plaintiff is accordingly entitled to, and should be awarded, full disability income benefits under the 2002-2003 policies for the period from September 2007 forward, along with all other relief such as that sought by Plaintiff under the Seventh Cause of Action above.

## FOR A NINTH CAUSE OF ACTION

### Claim for Unjust Enrichment

113.   All allegations of this Complaint, to the extent not inconsistent, are incorporated by reference for purposes of this claim.

114.   After suspending payment of benefits to Plaintiff under the 2002-2003 policies in September 2007, NML misleadingly induced Plaintiff to continue paying premiums under the 2002-2003 policies.   Under those policies, further payment of premiums would not have been required if NWM had not suspended payment of benefits to Plaintiff under those policies. Nor was payment of premiums necessary to preserve and pursue Plaintiff's claims for continued benefits under those policies.

115.   NML has been unjustly enriched by Plaintiff's payment of premiums under the 2002-2003 policies after NML suspended and eventually denied payment of continuing benefits to Plaintiff under those policies.   NML should in justice and equity make restitution of those premium payments to Plaintiff.   The trier of fact should so find and declare, and award Plaintiff restitution of her premium payments to NML since September 2007, with prejudgment interest at a rate of 8.75% per annum pursuant to South Carolina Code § 34-31-20(A).

116.   Plaintiff is also entitled to recover compensatory damages from NML for the foreseeable emotional distress that NML caused Plaintiff by misleadingly inducing her to pay unnecessary quarterly premiums, ranging over time from $601.90 to $732.30, for the 2002-2003 policies during a period when Plaintiff and her family were undergoing acute financial distress due to NML's denial of her claim for continuing disability income benefits under those same policies.

117.    Plaintiff is also entitled to recover punitive damages from NML for its willful and reckless disregard of Plaintiff's rights under the insurance policies sold by NML to Plaintiff.

### Prayer for Relief

WHEREFORE, having fully stated her complaint against Defendant NML, Plaintiff respectfully prays that the trier of fact award Plaintiff all of the relief requested above, as well as such other and further relief as the Court deems just and proper, including without limitation the following:

(a)    recovery of the present value of full disability income benefits under the 2002-2003 policies for Plaintiff's entire actuarial lifetime going forward, or alternatively, a decree that NML is required to perform under the 2002-2003 policies by providing Plaintiff with full monthly disability income benefits thereunder on an ongoing basis into the future, so long as Plaintiff remains disabled by ECT-induced memory loss and/or malignant depression, or otherwise, from resuming her OB/GYN medical specialty;

(b)    recovery of full disability income benefits under the 2002-2003 policies for the period from September 2007 to the date of judgment, plus prejudgment interest thereon at a rate of 8.75% per annum pursuant to South Carolina Code § 34-31-20(A);

(c)    restitution of Plaintiff's premium payments to NML for the 2002-2003 policies since September 2007, plus prejudgment interest thereon at a rate of 8.75% per annum pursuant to South Carolina Code § 34-31-20(A);

(d)    recovery of compensatory damages for the severe emotional distress inflicted on Plaintiff by NML, in the amount of at least $3 million;

(e)      recovery of all other consequential, special, or other compensatory damages for NML's denial of Plaintiff's claims under the insurance policies that she purchased form NML, including (without limitation) compensation to make Plaintiff whole for withdrawals from Plaintiff's and her husband's 401K retirement accounts since September 2007, and compensation for all costs incurred by Plaintiff and her husband since that time that would not otherwise have been incurred but for NML's denial of Plaintiff's claims, including (without limitation) debt costs, all costs of pursuing medical retraining and continuing medical education, and all out-of-pocket costs incurred for medical treatment due to Plaintiff's relapse into active malignant depression as a result of NML's denial of Plaintiff's claims.

(f)      recovery of punitive damages from NML for its willful and reckless disregard of Plaintiff's rights under the insurance policies sold by NML to Plaintiff, in an amount up to ten times the aggregate value of all compensatory damages and relief awarded to Plaintiff; and

(g)      recovery from NML, under South Carolina Code § 38-59-40 and otherwise, of all of Plaintiff's attorneys' fees and other litigation costs, including (without limitation) all costs associated with expert witnesses, incurred in pursuing Plaintiff's claims herein, including (without limitation) Plaintiff's claims for continuing disability income benefits under the 2002-2003 policies that NML denied without reasonable cause and/or in bad faith.

 s/  Robert E. Hoskins
Robert E. Hoskins, Esq.
Federal Bar No. 5144
**FOSTER LAW FIRM, L.L.C.**
PO Box 2123
Greenville, SC 29602
(864) 242-6200
(864) 233-0290 (facsimile)
E-mail: rhoskins@erisaexperience.com

Timothy W. Bergin, Esq.
(Pending *Pro Hac Vice* Admission)
Winstead PC
1120 20th St., N.W., Suite 700N
Washington, DC 20036-3406
(202) 572-8024
(202) 572-8001 (facsimile)
E-mail: tbergin@winstead.com

Date:  November 15, 2010                    Attorneys for Plaintiff

5601258v.1