**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| JANE DOE, ) | |
| ) | Civil No. 2:10-cv-2961 |
| Plaintiff, ) | |
| ) | **ORDER** |
| vs. ) | |
| ) | |
| NORTHWESTERN MUTUAL LIFE ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the court on defendant's seven motions for summary judgment. Based on the following, the court grants defendant's motions for summary judgment on the negligence, negligent misrepresentation, reformation, specific performance, promissory estoppel, equitable estoppel, and unjust enrichment claims and plaintiff's requests for future insurance benefits and punitive damages, but denies defendant's motions on plaintiff's bad faith claim, for damages from emotional distress, and concerning the statute of limitations for breach of contract and bad faith.

## I.  BACKGROUND

Plaintiff claims she is disabled from a medical condition caused by electroconvulsive therapy (ECT) treatments, and that defendant Northwestern Mutual Insurance Company (Northwestern) has improperly denied coverage for this condition based on an inappropriately applied twenty-four month limitation period. On November 15, 2010, plaintiff sued Northwestern for breach of contract, specific performance, breach of the implied covenant of good faith and fair dealing,

1

reformation, equitable estoppel, promissory estoppel, negligence, negligent misrepresentation, and unjust enrichment.

In 1996, plaintiff purchased her first disability insurance policy from Mr. Stephen Riggs, a Northwestern insurance agent. In 2002 and 2003, she purchased two additional policies pursuant to an Additional Purchase Benefit (APB) rider in the 1996 policy. The 1996 policy did not contain a time limitation on coverage for mental disorders, but the two subsequent policies only covered mental disorders for twenty-four months. Because of plaintiff's current condition, she cannot remember the substance of any of the conversations she had with Mr. Riggs concerning her application for and purchase of these policies.

Plaintiff was diagnosed with severe malignant depression on June 24, 2005, and applied for disability benefits under all three policies that August. On October 6, 2005, Northwestern approved plaintiff's claim for disability coverage based on depression. From July 14, 2005 through September 27, 2005, doctors at the Medical University of South Carolina (MUSC) administered twenty-one bilateral ECT treatments to plaintiff to treat her depression.[1] As discussed in this court's May 1, 2012 order on defendant's motions in limine, recent research indicates that bilateral ECT treatments can cause long-term retrograde memory loss, and some doctors claim it also can cause long-term anterograde memory loss, though sufficient peer reviewed studies have yet to conclusively establish the latter.

Plaintiff underwent memory testing in November 2005, February 2006, and January 2007, and three later occasions. Plaintiff's treating physicians advised her

---

[1] ECT is a procedure in which electric currents are passed through the brain by way of electrodes placed on both sides of the head, deliberately triggering a brief seizure. This procedure is prescribed for patients with severe medication resistant depression.

2

that these tests indicated memory loss.  In July 2007, plaintiff notified Northwestern for the first time that she had a disabling medical condition which was separate and apart from her depression.  In September 2007, due to the twenty-four month limitation, plaintiff received her last disability payment under the 2002 and 2003 policies.  Defendant then advised plaintiff that it was investigating whether it should resume making payments based on her newly claimed medical condition.  On February 8, 2008, Northwestern sent plaintiff's husband a letter which informed him that it had conducted an investigation and determined that plaintiff was disabled due to depression; therefore the twenty-four month limitation period barred future coverage on the 2002 and 2003 policies.

On April 16, 2008, Mr. Riggs sent the President of Northwestern a letter "on behalf of [plaintiff]," which said,

> What [Plaintiff] or her agent didn't know [in purchasing the disability policies], is that the finest insurance company in the world would change the future contracts that she was being guaranteed the right to purchase; which she thought would be identical to the original contract, not one that would have limitations to coverage that her original does not have. . . .
>
> [Plaintiff] thought she was purchasing a contract that would protect her family from economic loss due to a disability; it seems she was wrong. And I guess I was wrong in believing that the policy I was initially selling [Plaintiff] would protect her, and Northwestern Mutual Life would take care of her.  I wonder about the ethics of all this, is the best I can expect from the finest insurance company in America? . . . .
>
> I have represented NML for 26 years and would hate to think I made a mistake by selling her this contract and the great company which stands behind it.

Pl.'s Opp. First Mot. Summ. J. Ex. 8.

At his deposition, Mr. Riggs explained that in 1996, he could only "sell [plaintiff] a small policy with the additional purchase option to buy more," with "no medical questions asked." Riggs Dep. 13:16-18. Mr. Riggs noted that when he sold plaintiff the 1996 policy, he knew that Northwestern "had the right to change" the terms of their future policies, id. at 25:24-27; 26:13-14; 26:17-27:5, but that prior to 1996, Northwestern had only improved the contractual provisions. Id. at 27:1-9. Mr. Riggs explained that he did not tell plaintiff that Northwestern had only improved contractual provisions up to that point in time. Id. 27:8-9. Furthermore, when plaintiff purchased the 2002 and 2003 policies, Riggs stated that he knew the mental disorder limitation period was twenty-four months, the limitation was included in the coverage outline, he always went over the coverage outline with applicants if they would give him the time, and he had no reason to believe that he did not follow this standard operating procedure with plaintiff, though he did not remember all the specifics of the conversation. Id. at 27:24-28:5; 119:1; 122:11-16. Additionally, he did not believe plaintiff had asked about the mental disorder limitation period. Id. at 27:23-5.

On May 2, 2008, plaintiff's attorney asked Northwestern to reconsider its denial of benefits. On October 23, 2008, Northwestern sent a letter affirming its denial of benefits.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."

4

Fed. R. Civ. P. 56(c). Summary judgment is inappropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The court should view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor. Anderson, 477 U.S. at 255. If evidentiary materials eliminate all factual disputes, summary judgment is appropriate on questions of law. Scott v. Harris, 550 U.S. 372, 381 n.8 (2007).

### III.   DISCUSSION

#### A.   Negligent Misrepresentation

> To establish liability for negligent misrepresentation, the plaintiff must show (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the representation; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance upon the representation.

Sauner v. Pub. Serv. Auth. of S.C., 581 S.E.2d 161, 166 (S.C. 2003) (internal quotations omitted).

Plaintiff has failed to allege facts upon which a reasonable jury could find that Mr. Riggs made a false representation to plaintiff. Plaintiff does not remember the

5

substance of her conversations with Mr. Riggs nor can she point to any other witness, document, or evidence demonstrating that Mr. Riggs made a false statement to her. While it is clear that Mr. Riggs was aware in 2008 that plaintiff believed her coverage was broader than it was in reality, this is insufficient evidence for a reasonable fact finder to conclude that Mr. Riggs falsely represented the extent of plaintiff's coverage.  Mr. Riggs stated that in 1996, he knew that Northwestern could change the terms of its future policies purchased under the APB.  At his deposition, Mr. Riggs expounded that Northwestern had only improved its contract provisions up to that point in time, but he said he did not discuss this with plaintiff.  Additionally, Mr. Riggs explained that at the time plaintiff purchased the 2002 and 2003 policies, he knew that the policies only covered mental disorders for twenty-four months.  Mr. Riggs did not remember the specifics of his 2002 and 2003 conversations with plaintiff, but believed he would have followed his standard operating procedure of discussing the guide to the policy provisions, which included the mental disorder limitation.  Riggs Dep. 118:6-119:24; 122:10-16.  Thus, the only evidence before the court is that Mr. Riggs was aware of the correct coverage and there is no evidence that he gave plaintiff information contrary to his understanding of the policies. Therefore, summary judgment is appropriate for defendant on this claim.

    **B.   Promissory Estoppel**

"In order to recover under a theory of promissory estoppel, a claimant must demonstrate:  (1) the presence of a promise unambiguous in its terms; (2) reasonable reliance on the promise; (3) the reliance was expected and foreseeable; and (4) injury in reliance on the promise." Craft v. S.C. Comm'n for the Blind, 685 S.E.2d 625, 627

(S.C. Ct. App. 2009). Plaintiff's complaint states that Mr. Riggs promised plaintiff that through the APB in the 1996 policy, all future policies would be governed by the terms of that policy. Based on the evidence discussed above, plaintiff has failed to provide facts upon which a reasonable jury could reach this conclusion; therefore, summary judgment is granted for defendant on plaintiff's promissory estoppel claim.

### C. Reformation

Plaintiff claims that the 2002 and 2003 policies should be reformed to delete the mental disorder limitation period based on mutual mistake. The 1996 APB clearly and unambiguously states that new policies will be governed by terms applicable at the date the new policy is issued, i.e., the terms of the 1996 policy will not govern future policies issued pursuant to the APB. The contract is not ambiguous, nor subject to multiple interpretations. See S.C. Dep't of Natural Res. v. Town of McClellanville, 550 S.E. 299, 302-03 (S.C. 2001). "[W]hen a contract is clear and unambiguous, the construction thereof is a question of law for the court," Bowen v. Bowen, 547 S.E.2d 877, 880 (S.C. Ct. App. 2001), and the court does not have authority to modify the terms of the contract. Patricia Grand Hotel, LLC v. MacGuire Enters., 643 S.E.2d 692, 695 (S.C. Ct. App. 2007). There is no evidence that the 1996 APB was any other than that provided by defendant to the court.[2] At the hearing on the instant motion, plaintiff's counsel agreed that there was no evidence the 1996 policy originally lacked an APB, and there are no reasonable

---

[2] Toney v. Ability Ins. Co., No. 10-2311, 2011 WL 4403295, at *3-6 (D.S.C. Sept. 21, 2011), is clearly distinguishable from the present case because the plaintiff in Toney was able to show that the insurance provider sent insureds two different APB forms, thus creating a genuine issue of material fact regarding which APB should govern. Here, plaintiff has provided no evidence to support a finding that another APB existed or was ever sent to insureds for 1996 policies. In fact, there is no evidence whatsoever that any potential witness even believes an APB other than the one provided by defendant was given to plaintiff.

inferences based on the evidence before the court that could lead to a contrary reasonable conclusion.  Mr. Riggs explained that in 1996 he knew that Northwestern could change the terms of the policy provisions, and those changes would govern future policies issued under the APB.  Additionally, the 2002 and 2003 policies clearly state that mental disorders will only be covered for a period of twenty-four months.  Mr. Riggs explained that he knew that mental disorders were limited to twenty-four months of coverage when he sold plaintiff the 2002 and 2003 policies and probably discussed this limitation with her.

Under South Carolina law, reformation of coverage on an insurance contract is permitted only if the insured and the insurer both intended that the same coverage apply.  George v. Empire & Marine Ins. Co., 545 S.E. 2d 500 (S.C. 2001).   Plaintiff has failed to provide any evidence that defendant or defendant's agent was mistaken regarding the twenty-four month limitation period in the 2002 and 2003 policies or concerning defendant's ability to change future policies from the 1996 policy terms. It is axiomatic to say that a mutual mistake requires that both parties are mistaken. Since plaintiff has failed to demonstrate any mistake on defendant's part, summary judgment is appropriate for defendant on plaintiff's request for reformation.

**D.     Negligence**

Plaintiff claims Mr. Riggs was negligent for not pointing out the change in the 2002 and 2003 policies which limited coverage for mental disabilities to twenty-four months.  Plaintiff, however, has failed to provide facts upon which a jury could reasonably believe that Mr. Riggs failed to inform plaintiff of the mental disorder limitation.

Plaintiff cannot testify that Mr. Riggs did not tell her about the limitations because she does not remember her conversations with Mr. Riggs.  Additionally, Mr. Riggs remembers very little of the conversations he had with plaintiff and certainly did not testify that he failed to provide this information to her.  While Mr. Riggs did not believe plaintiff specifically asked about or addressed mental disorders in 2002 or 2003, he stated that it is his standard operating procedure to go through the guide to policy provisions with applicants if they give him time to do so, that the guide to the 2002 and 2003 policy provisions included the limitation on mental disorders, and that he had no reason to believe he did not follow his standard operating procedure with Doe.  Riggs Dep. 27:16-28:5; 118:11-119:1; 122:11-16; 135:10-136:4.  Mr. Riggs' statement that in 2008, Doe believed her coverage on her 2002 and 2003 policies was the same as her 1996 policy by itself is insufficient to prove that Doe's misunderstanding was caused by Mr. Riggs' failure to disclose information to her.  Because Doe failed to provide evidence upon which a reasonable jury could conclude Mr. Riggs did not tell her about the mental disorder time limitation, this court grants summary judgment to defendant on plaintiff's negligence claim.

Additionally,

> [T]here is a line of cases in South Carolina holding that where an insured fails to read and familiarize himself with a policy, the insured abandons all care and is thus more negligent than the agent.  See Carolina Prod. Maint., Inc. v. U.S. Fid. & Guar. Co., 425 S.E.2d 39, 42 (S.C. Ct. App. 1992).  See also Doub v. Weathersby-Breeland Ins. Agency, 233 S.E.2d 111 (S.C. 1977).

Mullen v. State Farm Cas. & Fire Co., No. 09-2392, 2010 WL 2228369, at *2 (D.S.C. June 1, 2010); see also Provident Life & Acc. Ins. Co., 166 F.2d 492, 495 (4th Cir. 1948); Pitts v. Jackson Nat. Life Ins. Co., 574 S.E.2d 502, 511 (S.C. Ct. App. 2011).

While a policy holder's duties are less demanding at the reapplication stage where she already has a relationship with the insurance agent, the only cases permitting a plaintiff to survive summary judgment without reading the contract even at this stage have involved disputes over terms that a layman could not be expected to understand, which is not the case at bar. See Great Am. Ins. Co. v. Mills, No. 06-1971, 2008 WL 2250256 (D.S.C. 2008); Riddle-Duckworth, Inc. v. Sullivan, 171 S.E.2d 486 (S.C. 1969); see also Orangeburg Sausage Co. v. Cincinnati Ins. Co., 450 S.E.2d 66 (S.C. Ct. App. 1994). "These cases would present marked difficulty for [plaintiff]" even if she were able to show that defendant had failed to verbally inform her of the twenty-four month limitation period. Mullen, 2010 WL 2228369, at *2.[3]

### E.     Equitable Estoppel

> Under South Carolina insurance law, estoppel cannot extend or create coverage. Campbell v. N. Ins. Co. of N.Y., 337 F. Supp. 2d 764, 770 (D.S.C. 2004). This rule is subject to one exception: "the scope of risk under an insurance policy may be extended by estoppel if the insurer has misled the insured into believing the particular risk is within the coverage." Standard Fire Ins. Co. v. Marine Contracting & Towing Co., 392 S.E.2d 460, 462 (1990).
>          . . . .
> South Carolina has not adopted the doctrine of "reasonable expectations" in construing insurance policies. The doctrine of reasonable expectations recognizes "the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts . . . even though painstaking study of the policy provisions would have negated those expectations." Allstate Ins. Co. v. Mangum, 383 S.E.2d 464, 467 (S.C. Ct. App. 1989). This rule "has never been accepted by the supreme court of this state." Id.

---

[3] Plaintiff may also be intending to argue that Mr. Riggs failed to adequately explain the 1996 APB to her, though that argument is not easily ascertained from the complaint. If plaintiff is making that argument, it too would fail. Mr. Riggs stated in his deposition that he believed he went through the contract provisions with plaintiff in 1996, and plaintiff provides no evidence to the contrary. Furthermore, plaintiff would have an even more difficult time overcoming her failure to read the policy at the first application stage in 1996 when no relationship existed between the applicant and the insurance agent.

Southern Land & Golf Co. v. Harleysville Mut. Ins. Co., No. 03-2189, 2006 WL 2443340, at *3 (D.S.C. Aug. 22, 2006).  As previously discussed, plaintiff has failed to provide any evidence that defendant misled plaintiff about the extent of coverage under the policies; therefore, summary judgment is granted to defendant on plaintiff's equitable estoppel claim.

### F.   Statute of Limitations on Breach of Contract and Bad Faith

A reasonable trier of fact could find that Doe made a new claim for disability coverage due to ECT induced impairments which was denied for the first time in February of 2008, making plaintiff's November 2011 filing timely.  Therefore, defendant's motion for summary judgment based on the statute of limitations is denied.[4]

### G.   Bad Faith & Attorney's Fees

"The elements of a bad faith refusal to pay action are:  (1) the existence of a contract of insurance between the parties; (2) refusal by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or unreasonable action; and (4) causing damage to the insured."  Snyder v. State Farm Mut. Auto. Ins.

---

[4] Because the evidence presented by plaintiff is sufficient to satisfy a three year statute of limitations, the court need not reach the question of whether a six year statute of limitations applies to insurance contracts generally or under the specific terms of this contract.  However, defendant would face an uphill battle to demonstrate that a six year period is inappropriate in light of South Carolina insurance regulations and case law.  See S.C. Ins. Code § 38-71-340(11) ("No legal action may be brought to recover on this policy within sixty days after written proof of loss has been given as required by this policy.  No such action may be brought after six years from the time written proof of loss is required to be given."); Johnson v. Comm. Travelers Mut. Accident Ass'n of Am., 131 S.E.2d 91, 95 (S.C. 1963) ("Having decided that the contract in question is controlled by and subject to our Insurance Code, any policy provisions inconsistent therewith are void and the pertinent provisions of the Statute prevail as much as if expressly incorporated in the policy."); Comer v. Life Ins. Co. of Ala., No. 08-0228, 2010 WL 233857, at *7 (D.S.C. Jan. 14, 2010) ("Accordingly, the court finds that a six year statute of limitations applies to the breach of contract claim and that the claim in the case began to run at the time of breach.").

Co., 586 F. Supp. 2d 453, 457 (D.S.C. Feb. 22, 2008). Only the third element is at issue on summary judgment.

> In South Carolina, an insurer cannot be liable for bad faith refusal to pay proceeds due under an insurance agreement if there exists an objectively reasonable basis for denying the insured's claim. See Varnadore v. Nationwide Mut. Ins. Co., 345 S.E.2d 711, 713-14 (S.C. 1986). Whether such an objectively reasonable basis for denial exists depends on the circumstances existing at the time of the denial. Id. Therefore, when conflicting evidence has been presented, a directed verdict is generally inappropriate, and the issue of bad faith should be decided by the jury. See Nichols v. State Farm Mut. Auto. Ins. Co., 306 S.E.2d 616, 619 (S.C. 1983).

State Farm Fire & Cas. Co. v. Barton, 897 F.2d 729, 731 (4th Cir. 1990).

Plaintiff and defendant agree that the relevant date for denial of coverage the court should consider is defendant's final denial on October 23, 2008. Considering the evidence in the light most favorable to plaintiff, a reasonable jury could conclude that defendant acted in bad faith or unreasonably denied coverage based on deficiencies in the report of defendant's only expert on ECT related impairments and defendant's failure to investigate further in light of these deficiencies. The expert report, viewed in the light most favorable to plaintiff, indicates that defendant's ECT expert was unaware of key studies in the field (which plaintiff had provided to defendant), that the expert misunderstood or was unaware of certain material facts (for instance, the reason Doe's medical license was reinstated), and that some of his other statements concerning ECT treatments' long term effects were ambiguous. As noted above, defendant did not follow up on these problems.[5] Based on the

---

[5] Defendant claims that it was not bad faith to fail to require its expert to speak with Doe or her treating physicians because these steps would not have provided any material information which could have changed the expert's mind or the final outcome. This argument brings to mind the saying, "Don't confuse me with the facts, my mind's made up." In this court's May 2012 order, the court discussed that retrograde amnesia is typically diagnosed by a patient's self-reports and observations of treating

foregoing, plaintiff has established a genuine issue of material fact regarding whether defendant unreasonably denied her coverage.

### H.  Specific Performance

Plaintiff seeks specific performance of the 2002 and 2003 policies, as well as the 1996 APB "for Northwestern's breach thereof." Defendant claims this cause of action should be dismissed because plaintiff has an adequate remedy at law.

In order to grant specific performance,

> a court in equity must find: (1) there is clear evidence of a valid agreement; (2) the agreement had been partly carried into execution on one side with the approbation of the other; and (3) the party who comes to compel performance had performed his or her part, or has been and remains able and willing to perform his or her part of the contract.

Ingram v. Kasey's Assocs., 531 S.E.2d 287, 291 (S.C. 2000). "Specific performance should be granted only if there is no adequate remedy at law, and specific enforcement of the contract is equitable between the parties." Id. "Whether an adequate remedy at law exists hinges on whether the object of the contract is so peculiar in value as to give rise to an equity for the specific performance of the contract without referring to its quality or quantity." 12 S.C. Jur. Equity § 20 (June 2012).

> [S]pecific performance is not an absolute right, and a court granting it must follow established principles and carefully consider all the circumstances of the particular case. Bishop v. Tolbert, 153 S.E.2d 912, 917 (1967). Generally, a court will not order specific performance that would require "continuous direction and supervision of the court," but an exception to this rule exists for cases in which the public has an interest. 81A C.J.S. Specific Performance § 65 (2004).

---

physicians. Therefore, drawing all reasonable inferences in plaintiff's favor, an evaluation of plaintiff or speaking with plaintiff's treating physicians could have changed the expert's mind regarding her condition.

Time Warner Cable v. Condo Servs., Inc., 672 S.E.2d 816, 819 (S.C. Ct. App. 2009).

In the present case, plaintiff seeks money due under her Northwestern insurance policies both retroactively and prospectively. The retrospective payments are obviously not so peculiar that plaintiff's remedy at law is inadequate. Plaintiff's prospective payments, on the other hand, would require continuous direction and supervision of the court because it is uncertain whether plaintiff's condition will remain constant, i.e., whether her cognitive impairments will resolve as did the impairments of some of the patients in the ECT study cited in the May 2012 order.[6] Even if all of the facts exist as plaintiff alleges, it would still be inequitable for the court to require Northwestern to indefinitely make future disability payments to plaintiff because there is insufficient scientific evidence demonstrating that plaintiff's condition is permanent. As discussed below in the future payment of benefits section, if the jury finds that defendant breached the contract, and thereafter defendant fails to pay plaintiff's benefits, she can sue defendant for this breach, and if the facts warrant, punitive damages could be appropriate. Plaintiff fails to suggest to the court any other remedy unavailable to her at law which would make specific performance appropriate. Because plaintiff has an adequate remedy at law for retroactive payments and it would be inappropriate for the court to grant prospective payments based on the facts of this case, the court grants defendant's motion for summary judgment on plaintiff's specific performance claim.

### I.  Unjust Enrichment

> The elements to recover for unjust enrichment . . . are: "(1) a benefit conferred by the plaintiff upon the defendant; (2) realization of

---

[6] Sackeim et al., The Cognitive Effects of Electroconvulsive Therapy in Community Settings, Neuropsychopharmocology, 2007/Jan.; vol. 32(1): 244-54.

>   that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value." Myrtle Beach Hosp., Inc. v. City of Myrtle Beach, 532 S.E.2d 868, 872 (S.C. 2000).

Regions Bank v. Wingard Prop., Inc., 715 S.E.2d (S.C. Ct. App. 2011).

Plaintiff claims that Northwestern misled plaintiff, through plaintiff's attorney, into believing that she must continue paying premiums in order to maintain her claim for benefits for cognitive impairments caused by ECT treatments. On June 13, 2008, a Northwestern representative sent plaintiff's attorney a letter stating that premiums should be paid to "protect the owner's interest in the policy." Sobiesky Letter (6/13/2008). Plaintiff's counsel then contacted Northwestern to determine whether plaintiff must continue paying premiums on the 2002 and 2003 policies to maintain the claim that Northwestern was reviewing. See Sobiesky Letter (9/17/2008). Northwestern sent another letter dated September 17, 2008 explaining,

>   I would of course urge [plaintiff] to continue the premium payments while the claim is being evaluated to protect the owner's interest in the policies. . . . Whether or not they make the decision to pay current or future premiums will have no effect on my current review of their request for additional benefits. My current review does not affect or protect the interest of the policies unless we are able to approve the claim.

The September 17, 2008 letter clarified that plaintiff should continue paying premiums if she wanted to maintain those policies (for example, in order that she might be able to claim disability benefits if she were later diagnosed with cancer) but that payment of those premiums would not affect the claim for benefits that was under review at the time. Plaintiff's attorney argues that this did not provide sufficient clarification, but provides no evidence that plaintiff sought further explanation after the September 2008 letter. A misunderstanding by plaintiff after

15

defendant has explained the benefits of continuing to pay premiums does not make defendant's retention of the premiums inequitable. There is no evidence that defendant delayed in providing clarification to plaintiff's attorney or otherwise acted unjustly in receiving plaintiff's premium payments, which conferred a potentially valuable benefit to plaintiff. Because plaintiff has failed to show that it would be inequitable for defendant to retain the premiums, summary judgment is granted on this claim.

### J.     Actual Damages

#### 1.     Future Benefits Payments

Defendant argues that plaintiff should not be able to recover future benefit payments on an insurance contract based on O'Dell v. United Insurance Co. of America, 132 S.E.2d 14 (S.C. 1963) and Odiorne v. Prudential Insurance Company of America, 179 S.E. 669, 670 (S.C. 1935). Plaintiff argues that those cases are not applicable to bad faith claims. In University Medical Associations of MUSC v. Unumprovident Corp., 335 F. Supp. 2d 702, 711 (D.S.C. 2004), this court ruled that O'Dell and Odiorne had not been overruled and are applicable to a claim for bad faith. In this case, as in O'Dell and Odiorne, future benefits payments are speculative and cannot be reduced to a certainty because plaintiff's life span and the duration of her condition are unknown. As this court's May 2012 order explained, studies on ECT related cognitive impairments are on the cutting edge of science, have only measured effects up to six months, and have shown that some patients' impairments improve over time. If in the future defendant were to deny plaintiff coverage (assuming that a fact finder found for plaintiff at trial), plaintiff could bring another

suit for damages, and if the evidence demonstrates that defendant's denial is in willful, wanton, or reckless disregard of plaintiff's rights, an award of punitive damages may be appropriate.

### 2. Emotional Distress

In University Medical Associations of MUSC, 335 F. Supp. 2d at 711, this court held that emotional damages are available for a bad faith claim. Defendant asks this court to reconsider its holding in that case. This court reached that holding based on a published opinion by the Fourth Circuit, State Farm Fire & Cas. Co. v. Barton, 897 F.2d 729, 732-33 (4th Cir. 1990), which has not been overruled; therefore, the court denies defendant's motion for summary judgment for damages from emotional distress.[7]

### K. Punitive Damages

A plaintiff may recover punitive damages on a negligence or bad faith claim if she can "demonstrate the defendant's conduct was willful, wanton, or undertaken in reckless disregard of plaintiff's rights." Kuznik v. Bees Ferry Assocs., 538 S.E.2d 15, 32 (S.C. Ct. App. 2000). The court has granted summary judgment on plaintiff's negligence claim, therefore plaintiff's punitive damages request hinges on her claim for bad faith.

> Conduct is willful, wanton, or reckless when it is committed with a deliberate intention or in such a manner or under such circumstances that a person of ordinary prudence would be conscious of it as an invasion of another's rights. Cohen v. Allendale Coca-Cola Bottling Co., 351 S.E.2d 897 (S.C. Ct. App. 1986). It is the present consciousness of wrongdoing that justifies the award of punitive damages against the wrongdoer. Id.
> . . . .

---

[7] Plaintiff has withdrawn her request for damages based on potential income from 401(k) accounts and damages from tax penalties.

> Thus, the proper test for punitive damages - that at the time of his act or omission to act the tortfeasor be conscious, or chargeable with consciousness of his wrongdoing. Rogers v. Florence Printing Co., 106 S.E.2d 258, 264 (S.C. 1958).

Bryant v. Muskin Co., 873 F.2d 714, 714 (4th Cir. 1989).

"In any civil action where punitive damages are claimed, the plaintiff has the burden of proving such damages by clear and convincing evidence." S.C. Code Ann. § 15-33-135. When there is a lack of evidence of conduct which could support a punitive damages award, this issue is appropriate for resolution by the court as a matter of law. See, e.g., Muskin, 873 F.2d at 715; Cohen, 351 S.E.2d 897.

> A bad faith claim does not necessarily justify a claim for punitive damages.
>
> If an insured can demonstrate bad faith or unreasonable action by the insurer in processing a claim under their mutually binding insurance contract, he can recover consequential damages in a tort action. Actual damages are not limited by the contract. Further, if he can demonstrate the insurer's actions were willful or in reckless disregard of the insured's rights, he can recover punitive damages.

Nichols, 306 S.E.2d at 619.

Plaintiff has failed to provide evidence which a reasonable jury could conclude rises to the level of "clear and convincing" evidence that defendant was conscious of wrongdoing or reckless as to plaintiff's rights when it denied plaintiff coverage. As discussed in this court's May 2012 order, study of the effects of ECT treatment is pioneering research over which there is ongoing controversy in the medical community. Because there is insufficient evidence that defendant was willful or reckless of its potential wrongdoing when it accepted its ECT expert's report without further investigation, summary judgment is appropriate on this claim.

## IV.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that defendant's: first motion for summary judgment on the statute of limitations is **DENIED**, second motion on the bad faith claim and attorney's fees is **DENIED**, third motion on actual damages is **DENIED IN PART** concerning damages for emotional distress and **GRANTED IN PART** concerning future benefits, fourth motion on reformation is **GRANTED**, fifth motion on negligence and negligent misrepresentation is **GRANTED**, sixth motion on the equitable claims is **GRANTED**; and seventh motion on punitive damages is **GRANTED**.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**June 26, 2012**
**Charleston, South Carolina**